## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

JUANITA J. JACKSON,

                                        Plaintiff,

vs.                                                          CASE NO.:

EQUIFAX INFORMATION
SERVICES, LLC; EXPERIAN                      **JURY TRIAL DEMANDED**
INFORMATION SOLUTIONS, INC.;
and TRANS UNION, LLC,

                                        Defendants.

## COMPLAINT

Juanita J. Jackson ("Plaintiff") brings this Complaint against Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"), for actual, statutory, and punitive damages, costs, and attorneys' fees, for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of the Credit Bureau Defendants' inaccurate credit reporting and mixing of Plaintiff's credit file with the credit file of an unrelated consumer and inaccurately reporting Plaintiff as deceased and without a credit score.

## PRELIMINARY STATEMENT

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual citizens. Data technology, whether it be used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individuals to flow immediately to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of

1

society should benefit from the resulting convenience and efficiency.

2.      Unfortunately, however, this information has also become readily available for and subject to mishandling and misuse. Individuals can sustain substantial damage, both emotionally and economically, whenever inaccurate information or fraudulent information is disseminated about them.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      Theses CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, automobile dealers, potential employers, and other similar interested parties) information commonly called "consumer reports," concerning individuals who may be applying for retail credit, to lease an apartment, to obtain a mortgage, auto loan, employment, or the like.

5.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

6.      Congress made the following findings when it enacted the FCRA in 1970:

1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the  continued functioning of the banking system;

2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers;

3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers; and

4) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681a(1-4). Thus, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

7. Since 1970, when Congress enacted the FCRA, as amended, 15 U.S.C. § 1681 *et seq.*, federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

8. "Mixed files" create a false description and representation of a consumer's credit history.

9. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files and/or credit reports.

10. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

11. Mixed files are not a new phenomenon. The Credit Bureau Defendants have been on notice of the existence of mixed files and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently caused mixed files, for over thirty (30) years. *See Thompson v San Antonia Retail Merchants Ass'n,* 682 F.2d 509, 511 (5ᵗʰ Cir. 1982).

12. More recently, the Credit Bureau Defendants have been the subject of numerous state attorney general actions relating to their mixed file problems.

3

13.     For example, in 2015, the New York Attorney General filed charges and settled claims with Equifax, Experian, and Trans Union over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

14.     Notwithstanding the Credit Bureau Defendants' notice and being subject to repeated enforcement actions, mixed files persist despite consumers' unique personal identifying information, such as names, Social Security numbers, dates of birth, and addresses.

15.     Further, mixed files result in the disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.

16.     The Credit Bureau Defendants have each been sued thousands of times wherein an allegation was made that they violated the FCRA. Moreover, the Credit Bureau Defendants are sued, at a minimum, hundreds of times each year wherein an allegation is made that they mixed a consumers' credit file with that of another person.

17.     Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

18.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, the Credit Bureau Defendants

---

[1] https://blog.timesunion.com/capitol/archives/230235/schneiderman-announces-settlement-with-major-credit-reporting-agencies/ Last visited November 21, 2023; *see also* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited November 21, 2023.

continue to mix consumers' credit files with other consumers' credit files.

19.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

20.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' numerous disputes. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

20.     Most recently, a jury assessed a $60 million verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017) *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v TransUnion LLC* 951 F.3d 1008 (9th Cir. 2020). Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

21.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d

5

409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

22.     No less than three federal Courts of Appeal have held that a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

23.     Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including the Credit Bureau Defendants, to review their procedures when a mixed file case occurs.

24.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for the Credit Bureau Defendants, as well as innocent consumers, including Plaintiff.

### THE PARTIES

25.     Plaintiff Juanita J. Jackson ("Plaintiff") is a natural person who resides in the City of Nashua, County of Hillsborough, State of New Hampshire, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

26.     Defendant Equifax Information Services LLC ("Defendant Equifax" or "Equifax") is a foreign limited liability company authorized to do business in the State of New Hampshire, including in this District.

27.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

28.     Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a foreign corporation authorized to do business in the State of New Hampshire, including in this District.

29.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

30.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a foreign limited liability company authorized to do business in the State of New Hampshire, including in this District.

31.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

34.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect consumers' rights to fairness and accuracy in the reporting of their credit information.

35.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

36.     The FCRA further requires that when preparing consumer reports, a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### The Credit Bureau Defendants' Processing of Credit Information

37.     The Credit Bureau Defendants regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

38.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

39.     The Credit Bureau Defendants collect information from thousands of furnishers.

40.     The process by which the Credit Bureau Defendants receive, sort, and store information is largely electronic.

41.     Furnishers report credit information to the Credit Bureau Defendants through the use of coded tapes that are transmitted to the Credit Bureau Defendants on a monthly basis through software known as Metro 2.

42.     The Credit Bureau Defendants take the credit information reported by furnishers and create consumer credit files.

43.     The Credit Bureau Defendants maintain credit files on more than 200 million consumers.

44.     Credit files are frequently updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**The Credit Bureau Defendants' Mixed File Problem**

45.     The Credit Bureau Defendants know that different consumers can have similar names.

46.     The Credit Bureau Defendants know that different consumers can have similar Social Security numbers.

47.     The Credit Bureau Defendants know that different consumers with similar names can also have similar Social Security numbers.

48.     The Credit Bureau Defendants know that public records often do not contain identifying information such as Social Security numbers or dates of birth.

49.     The Credit Bureau Defendants will match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

50.     The Credit Bureau Defendants accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

51.     Sometimes the Credit Bureau Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a "mixed," "merged," or "combined" credit file.

52.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including the Credit Bureau Defendants, regarding their significant failures and deficiencies with respect to mixed files.

53.     Despite the Credit Bureau Defendants' long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by the Credit Bureau Defendants containing information belonging to another consumer.

54.     A mixed or merged credit file is the result of the Credit Bureau Defendants inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

55.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by the Credit Bureau Defendants to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

56.     The success or failure of these algorithms or rules is both a function of the rules themselves and the information provided by the furnishers of the tradeline information to the Credit Bureau Defendants.

57.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to the Credit Bureau Defendants.

58.     These rules also determine which credit files are selected by the Credit Bureau Defendants' algorithm(s) and merged to create a complete consumer report.

59.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

**The Credit Bureau Defendants' Practices Concerning the Sale of Reports on the "Deceased"**

60.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

61.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

62.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

63.     The Credit Bureau Defendants routinely place a "deceased" notation or marking on reports when they are advised by any of their many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

64.     The Credit Bureau Defendants' furnishing sources identify "deceased" consumers by marking the "status" of such consumers' responsibility for any subject account with an "X"

code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

65.    The Credit Bureau Defendants do not request or require a death certificate from any of their data sources, which advise that a consumer is "deceased," before placing a "deceased" mark in that consumer's credit file.

66.    The Credit Bureau Defendants do not request or require any proof from any data source, which advises that a consumer is "deceased," showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

67.    The Credit Bureau Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

68.    In some cases, to assure accuracy, the Credit Bureau Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. The Credit Bureau Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to them to be placed in said consumer's credit file or report.

69.    The Credit Bureau Defendants regularly receive the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But the Credit Bureau Defendants do not cross-reference the "X" code received from data furnishers with the Death Master File to determine whether any given

consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

72. The Credit Bureau Defendants will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

71. The Credit Bureau Defendants do not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

72. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the Credit Bureau Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

73. Even in instances where the purportedly deceased consumer communicates directly with the Credit Bureau Defendants, the Credit Bureau Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

74. Once a "deceased" mark is placed upon a consumer's report, the Credit Bureau Defendants will not calculate and will not provide a credit score for that consumer.

75. Upon the Credit Bureau Defendants' reports with a "deceased" mark sold to third parties, the Credit Bureau Defendants never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

76. The Credit Bureau Defendants know that third-party credit issuers require a credit score to process a given credit application.

77.     The Credit Bureau Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

78.     The Credit Bureau Defendants know that living consumers are routinely turned down for credit specifically because the Credit Bureau Defendants are reporting them as "deceased" and without a credit score.

79.     The Credit Bureau Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

80.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

81.     The Credit Bureau Defendants know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

82.     Nevertheless, the Credit Bureau Defendants do not employ any procedures to assure that a consumer marked as "deceased" on their credit reports are, in fact, deceased.

83.     Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

84.     The Credit Bureau Defendants do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

85.     Nor do the Credit Bureau Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

86.     For years after a consumer's actual death, the Credit Bureau Defendants will continue to sell credit reports about that consumer.

87.     The Credit Bureau Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

88.     The Credit Bureau Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

89.     The Credit Bureau Defendants profit from the sale of reports on deceased consumers.

90.     The Credit Bureau Defendants have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

91.     The Credit Bureau Defendants know that truly deceased consumers do not apply for credit.

92.     The Credit Bureau Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Credit Bureau Defendants to be a common and major source of identity theft.

93.     The Credit Bureau Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

94.     The Credit Bureau Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

95.     The Credit Bureau Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased, or for the purchasers of their reports who access the purportedly deceased consumer's information.

96.     The Credit Bureau Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

97.     For deceased consumers, there rarely, if ever, exists a permissible purpose under the FCRA for the Credit Bureau Defendants to sell their credit reports, absent a court order.

98.     The Credit Bureau Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Synchrony Bank Denies Plaintiff's Credit Application in December 2021**

99.     On or about December 17, 2021, Plaintiff applied for credit with the Home Shopping Network, provided by Synchrony Bank ("Synchrony").

100.     In order to determine whether Plaintiff was qualified for the credit that she sought, Synchrony Bank purchased Plaintiff's credit report and score from Experian and Trans Union.

101.     At the time of Plaintiff's credit application with Synchrony in December 2021, Plaintiff's Experian and Trans Union credit reports contained numerous credit account tradelines

falsely indicating that Plaintiff is deceased.

102.   At the time of Plaintiff's credit application with Synchrony in December 2021, Plaintiff's Experian and Trans Union credit reports also contained numerous credit account tradelines belonging to an unrelated consumer.

103.   Plaintiff's application for credit with Synchrony was denied based on the contents of her Experian and Trans Union credit reports.

104.    By reporting credit accounts and personal information in Plaintiff's credit files and reports, which belongs to an unrelated consumer, and reporting Plaintiff as deceased and without a credit score to Synchrony, Experian and Trans Union failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit file and report, in violation of 15 U.S.C. § 1681e(b).

### Plaintiff's Mixed Credit Files as of January 2022

105.   In or about late January 2022, worried about recent indications that she was being reported as deceased on one or more of her credit reports, Plaintiff obtained copies of her Equifax, Experian, and Trans Union credit reports. Upon reviewing the contents of her credit reports, Plaintiff was shocked to discover that they clearly contained credit account information from at least one unrelated consumer, much of which was negative.

106.   Additionally, Plaintiff was shocked to discover that Experian was reporting the following *eleven (11)* credit accounts with a deceased notation, which appeared on her Experian credit report as follows:

      i.   CREDIT FIRST NA/ FIRESTONE
           Account Number: 50953XXXX
           Date Opened: Dec 2013
           Status: Current, was past due 60 days. $266 written off.
           Responsibility: Deceased

ii.   KOHLS/CAPONE
Account Number: 639305071474….
Date Opened: May 2013
Status: Past due 150 days.
Responsibility: Deceased

iii.   SYNCB/AMAZON
Account Number: 604578104784….
Date Opened: Apr 2014
Status: Past due 120 days.
Responsibility: Deceased

iv.   SYNCB/CAR CARE PEP BOYS
Account Number: 650159011663….
Date Opened: Jul 2016
Status: Past due 30 days.
Responsibility: Deceased

v.   SYNCB/CARE CREDIT
Account Number: 601918343405….
Date Opened: Apr 2014
Status: Past due 150 days. $4,968 written off.
Responsibility: Deceased

vi.   SYNCB/JCPENNEY
Account Number: 600889330212….
Date Opened: Feb 2014
Status: Past due 60 days.
Responsibility: Deceased

vii.   SYNCB/LOWES
Account Number: 798192430074….
Date Opened: Feb 2014
Status: Past due 60 days.
Responsibility: Deceased

viii.   SYNCB/SHOP
Account Number: 604577120167….
Date Opened: Apr 2014
Status: Never late.

Responsibility: Deceased

    ix.    SYNCB/TJX COS
Account Number: 604585101497….
Date Opened: Dec 2013
Status: Past due 120 days.
Responsibility: Deceased

    x.    SYNCB/WALMART
Account Number: 604577120167….
Date Opened: Apr 2014
Status: Never late.
Responsibility: Deceased

    xi.    TBOM/MILESTONE
Account Number: 541051000206….
Date Opened: Aug 2016
Status: Closed. $563 written off.
Responsibility: Deceased

**Plaintiff's First Dispute with the Credit Bureau Defendants in January 2022**

107.    On or about January 30, 2022, concerned and anxious about the numerous inaccuracies in her credit reports and worried about the impact it could have on her future ability to obtain credit, Plaintiff mailed a letter, via certified mail, to each of the Credit Bureau Defendants disputing the inaccurate information contained within her respective credit files, namely, the credit accounts and personal information, which belong to an unrelated consumer, and any and all deceased notations and indicators that the Credit Bureau Defendants were reporting in her credit reports.

108.    As part of her disputes, Plaintiff specifically provided all of her personal identification information, including her full name, date of birth, Social Security number, and current address.

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

109.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

110.    The credit bureaus, including the Credit Bureau Defendants and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency- created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

111.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting  Resource Guide."

112.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

113.    Metro II codes are used on an industry wide form known within the credit  industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

114.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies, including the Credit Bureau Defendants.

115.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

116.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

117.     The data furnishers then have an obligation under the FCRA to conduct a reasonable investigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

118.     Once the data furnisher completes its investigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**The Credit Bureau Defendants' Responses to Plaintiff's January 2022 Dispute**

119.     Equifax failed to respond to Plaintiff's January 2022 dispute.

120.     Equifax failed to conduct a reasonable reinvestigation of the credit accounts and hard inquiries disputed by Plaintiff, or any reinvestigation at all, in violation of 15 U.S.C. § 1681i(a)(1)(A).

121.     Upon receiving Plaintiff's January 2022 dispute, Experian and Trans Union sent ACDVs to the furnishers of the credit accounts disputed by Plaintiff.

122.     After conducting a reinvestigation of Plaintiff's disputes, some of the furnishers responded to the ACDVs sent by Experian and Trans Union by confirming that the disputed accounts did not, in fact, belong to Plaintiff and, therefore, instructed Experian and Trans Union to delete such accounts from Plaintiff's credit files.

123.   On or about March 5, 2022, Experian completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff.

124.   Upon review, Plaintiff found that Experian removed and was no longer reporting the following disputed accounts on her Experian credit file:

   a)  SYNCB/LOWES, Account Number: 798192430074….

   b)  SYNCB/TJX COS, Account Number: 604585101497….

   c)  LVNV FUNDING LLC, Account Number: 546645112083

   d)  KOHLS/CAPONE, Account Number: 639305071474

   e)  TBOM/MILESTONE, Account Number: 541051000206

   f)  CACH LLC/RESURGENT CAP, Account Number: 93….

125.   Plaintiff was shocked and dismayed to discover that Experian continued to report a deceased notation on the following accounts, which belong to an unrelated consumer:

   a)  SYNCB/CAR CARE PEP BOYS, Account Number: 65015901163….

   b)  SYNCB/WALMART, Account Number: 603220363465….

   c)  SYNCB/CARE CREDIT, Account Number: 601918343405….

126.   Finally, Plaintiff was upset to discover that Experian continued to report the following tradelines on her Experian credit file, which belong to an unrelated consumer:

   a)  CONVERGENT OUTSOURCING, Account Number: 96585263

   b)  SYNCB/AMAZON, Account Number: 604578104784….

   c)  BANK OF AMERICA, Account Number: 488893708115….

   d)  CWS/CW NEXUS, Account Number: 449311000805….

   e)  SYNCB/SHOP, Account Number: 604577120167….

   f)  COMENITY BANK/LNBRYNT, Account Number: 697800502871….

g) TD BANK USA/TARGET CARD, Account Number: 585975200966….

h) PORTFOLIO RECOVERY ASSOC, Account Number: 468836764213….

i) COMENITYCB/OVERSTOCK, Account Number: 778840107057

j) KAY JEWELERS, Account Number: 314228….

k) CREDIT FIRST NA/FIRESTONE, Account Number: 50953….

l) ADS/COMENTIY/ZALES, Account Number: 578097406045….

m) MIDLAND FUNDING, Account Number: 30656….

n) MIDLAND FUNDING, Account Number: 30703….

o) MIDLAND FUNDING, Account Number: 30834….

p) I C SYSTEM INC, Account Number 113650146

127.    By failing to remove all deceased notations and credit accounts that do not belong to Plaintiff, Experian failed to conduct a reasonable reinvestigation of Plaintiff's January 2022 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

128.    On or about March 1, 2022, Trans Union completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff.

129.    Upon review, Plaintiff found that Trans Union removed and was no longer reporting the following disputed accounts on her Trans Union credit file:

a) AMERICAN EXPRESS, Account Number: 349992095225****

b) CAINE & WEINER, Account Number: 1148****

c) CREDIT ONE BANK, Account Number: 444796248023****

d) KOHLS DEPARTMENT STORE, Account Number: 639305071474****

e) LVNV FUNDING LLC, Account Number: 6369920232288****

f) THE BANK OF MISSOURI/MILSTNE, Account Number: 541051000206****

130. However, Plaintiff was disappointed to see that Trans Union continued to report the following accounts, which belong to an unrelated consumer:

a) AMERICAN EXPRESS, Account Number: 349992624869****

b) CACH LLC, Account Number: 9301**

c) CRDIT FIRST NATL ASSOC, Account Number: 50953****

d) COMENITY BANK/FULL BEAUTY, Account Number: 41279****

e) COMENITY BANK/LNBRYANT, Account Number: 697800502871****

f) COMENTIYCAPITALBANK.OVER, Account Number: 778840107057****

g) CW NEXUS CREDIT CARD HOL, Account Number: 449311000805****

h) LVNV FUNDING LLC, Account Number: 546645112083****

i) MIDLAND FUNDING LLC, Account Number: 30703****

j) MIDLAND FUNDING LLC, Account Number: 30834****

k) PORTFOLIO RECOVERY, Account Number: 468836764213****

l) SYNCB/SHOPHQ PLCC, Account Number: 604577120167****

m) KAY JEWLERS, Account Number: 314228****

n) TD BANK USA/TARGET CREDIT, Account Number: 585975200966****

o) WEBBANK/GETTINGTON, Account Number: 636992010144****

131. Trans Union also removed some of the personal information, including names, addresses, and phone numbers, that Plaintiff had disputed as not belonging to her.

132. By failing to remove all credit accounts that belong to an unrelated consumer from

Plaintiff's Trans Union credit file and report, Trans Union failed to conduct a reasonable reinvestigation of the credit information disputed by Plaintiff, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Second Dispute with the Credit Bureau Defendants in or about March 2022**

133.    In or about March 2022, soon after receiving dispute results from Experian and Trans Union, Plaintiff submitted an additional dispute to each of the Credit Bureau Defendants, respectively.

134.    Plaintiff again requested that the Credit Bureau Defendants reinvestigate the credit accounts and personal information that remained on her credit reports after her first dispute, which do not belong to her, including any and all accounts that included a deceased notation.

**The Credit Bureau Defendants' Responses to Plaintiff's March 2022 Disputes**

135.    In or about April 2022, Equifax, Experian, and Trans Union sent Plaintiff dispute results.

136.    In response to Plaintiff's dispute, Experian removed the following accounts, which continued to have a deceased notation following Plaintiff's January 2022 dispute and belong to an unrelated consumer, from Plaintiff's credit report:

        a)  SYNCB/CAR CARE PEP BOYS, Account Number: 65015901163….

        b)  SYNCB/WALMART, Account Number: 603220363465….

        c)  SYNCB/CARE CREDIT, Account Number: 601918343405….

137.    The Credit Bureau Defendants did not remove any of the other disputed information and continued to report it in Plaintiff's credit files and reports thereafter.

138.    By failing to remove the credit accounts that do not belong to Plaintiff from Plaintiff's credit files and reports, the Credit Bureau Defendants failed to conduct a reasonable

reinvestigation of the information disputed by Plaintiff, or any reinvestigation at all, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Experian Publishes an Inaccurate Credit Report Regarding Plaintiff in May 2022**

139.    On or about April 5, 2022, Plaintiff applied for a credit card issued by Credit One Bank NA ("Credit One").

140.    In order to determine whether Plaintiff was qualified for the credit that she sought, Credit One purchased Plaintiff's credit report and score from Experian.

141.    At the time of Plaintiff's credit application with Credit One in April 2022, Experian published a credit report to Credit One regarding Plaintiff that was mixed with an unrelated consumer's credit account information, and further included false and misleading information related to Plaintiff's credit history.

142.    Plaintiff's credit application with Credit One was adversely impacted as a direct result of the inaccurate information contained within her Experian credit report, which adversely impacted her debt-to-income ratio, her credit score, and overall creditworthiness.

143.    By reporting credit account and personal information, which belongs to an unrelated consumer, to a potential creditor in connection with Plaintiff's application for credit, Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit file and report, in violation of 15 U.S.C. § 1681e(b).

**Equifax and Experian Publish Inaccurate Credit Reports Regarding Plaintiff
to The Bank of Missouri in May 2022**

144.    On or about May 6, 2022, Plaintiff applied for an Aspire credit card issued by The Bank of Missouri ("TBOM").

145.    In order to determine whether Plaintiff was qualified for the credit that she sought,

TBOM purchased Plaintiff's credit reports and scores from Equifax and Experian.

146.    At the time of Plaintiff's credit application with TBOM in April 2022, Equifax and Experian published credit reports to TBOM regarding Plaintiff both of which were mixed with an unrelated consumer's credit account information, and further included false and misleading information related to Plaintiff's credit history.

147.    Plaintiff's credit application with TBOM was adversely impacted as a direct result of the inaccurate information contained within her Equifax and Experian credit reports, which adversely impacted her debt-to-income ratio, her credit score, and overall creditworthiness.

148.    By reporting credit account and personal information, which belong to an unrelated consumer, to a potential creditor in connection with Plaintiff's application for credit, Equifax and Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and reports, in violation of 15 U.S.C. § 1681e(b).

### Trans Union Publishes an Inaccurate Credit Report Regarding Plaintiff to TAB Bank in May 2022

149.    On or about May 6, 2022, Plaintiff applied for a Mission Lane credit card issued by TAB Bank.

150.    In order to determine whether Plaintiff was qualified for the credit that she sought, TAB Bank purchased Plaintiff's credit report and score from Trans Union.

151.    At the time of Plaintiff's credit application with TAB in May 2022, Trans Union published a credit report to TAB Bank regarding Plaintiff that was mixed with an unrelated consumer's credit account information, and further included false and misleading information related to Plaintiff's credit history.

152.    Plaintiff's credit application with TAB Bank was adversely impacted as a direct

result of the inaccurate information contained within her Trans Union credit report, which adversely impacted her debt-to-income ratio, credit score, and overall creditworthiness.

153.　　By reporting credit accounts and information, which belong to an unrelated consumer, to a potential creditor in connection with Plaintiff's application for credit, Trans Union failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit file and report, in violation of 15 U.S.C. § 1681e(b).

**Experian Publishes a Third Inaccurate Credit Report Regarding Plaintiff to Citibank in May 2022**

154.　　On or about May 10, 2022, Plaintiff applied for an Exxon Mobil credit card issued by Citibank, N.A. ("Citibank").

155.　　In order to determine whether Plaintiff was qualified for the credit that she sought, Citibank purchased Plaintiff's credit report and score from Experian.

156.　　At the time of Plaintiff's credit application with Citibank in May 2022, Experian published a credit report to Citibank regarding Plaintiff that was mixed with an unrelated consumer's credit account information, and further included false and misleading information related to Plaintiff's credit history.

157.　　Plaintiff's credit application with Citibank was adversely impacted as a direct result of the inaccurate information contained within her Experian credit report, which adversely impacted her debt-to-income ratio, credit score, and overall creditworthiness.

158.　　By reporting credit accounts and information, which belong to an unrelated consumer, to a potential creditor in connection with Plaintiff's application for credit, Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit file and report, in violation of 15 U.S.C.

§ 1681e(b).

### Plaintiff's Mixed Credit Files as of May 2022

159.    As of May 10, 2022, Plaintiff's Equifax credit report contained the following eight

(8) credit accounts, which belong to an unrelated consumer:

a)  ACCEPTANCE NOW
    Account Number:440003XXXXXXXXXX
    Date Opened: June 13, 2016
    Account Status: Closed

b)  CACH, LLC
    Account Number: 93XXXX
    Date Opened: May 26, 2017
    Original Creditor: Webbank
    Comments: Collection Account
    Balance: $7,219.00
    Account Type: Open

c)  CRDT FIRST
    Account Number: 509530XXX
    Date Opened: December 1, 2013
    Account Status: Open

d)  COMENITY BANK/FULL BEAUTY
    Account Number: 4XXXX
    Date Opened: August 27, 2015
    Account Status: Closed

e)  SYNCB/SHOPHQ PLCC
    Account Number: 604557XXXXXXXXXX
    Date Opened: April 1, 2014
    Account Status: Closed

f)  SYNCB/WALMART
    Account Number: 603220XXXXXXXXXX
    Date Opened: June 2, 2003
    Account Status: Closed

g)  VIVE FINANCIAL
    Account Number: 674185X
    Date Opened: July 10, 2014
    Account Status: Closed

    h)  WEBBANK/GETTINGTON
        Account Number: 636992XXXXXXXXXX
        Date Opened: May 10, 2013
        Account Status: Closed

160.    As of May 10, 2022, Plaintiff's Equifax credit report contained the following two

(2) Regular Inquiries, which belong to an unrelated consumer:

    a)  COMENITYBANK/WAYFAIR  DATE: 07/15/2020
    b)  WF CARD SVC           DATE: 01/05/2022

161.    As of May 10, 2022, Plaintiff's Experian credit report contained the following

sixteen (16) credit accounts, which belong to an unrelated consumer:

    a)  ACCEPTANCE NOW
        Account Number: R057440003010XXXXX
        Date Opened: June 13, 2016
        Account Status: Closed

    b)  ADS/COMENITY/LNBRYANT
        Account Number: 697800XXXXXXXXXX
        Date Opened: October 27, 2014
        Account Status: Closed

    c)  ADS/COMENITY/FULLBEAUTY
        Account Number: 41279
        Date Opened: August 27, 2015
        Account Status: Closed

    d)  ADS/COMENITY/OVERSTOCK
        Account Number: 778840XXXXXXXXXX
        Date Opened: December 8, 2014
        Account Status: Closed

    e)  ADS/COMENITY/ZALES
        Account Number: 578097XXXXXXXXXX
        Date Opened: March 17, 2016
        Account Status: Closed

    f)  CREDIT FIRST NA/ FIRESTONE
        Account Number: 50953XXXX
        Date Opened: December 3, 2013
        Account Status: Closed

g) CWS/CW NEXUS
   Account Number: 449311XXXXXXXXXX
   Date Opened: April 7, 2016
   Account Status: Closed

h) KAY JEWELERS
   Account Number:314228XXXX
   Date Opened: January 25, 2013
   Account Status: Closed

i) MIDLAND FUNDING
   Account Number: 306565XXX
   Date Opened: May 30, 2017
   Account Type: Debt Buyer
   Original Creditor: Comenity Capital Bank
   Balance: $927.00

j) MIDLAND FUNDING
   Account Number:307037XXX
   Date Opened: July 26, 2017
   Account Type: Debt Buyer
   Original Creditor: Credit One Bank NA
   Balance: $2,248.00

k) MIDLAND FUNDING
   Account Number: 308348XXX
   Date Opened: April 28, 2017
   Account Type: Debt Buyer
   Original Creditor: Comenity Capital Bank
   Balance: $2,363.00

l) SYNCB/AMAZON
   Account Number: 60457810XXXXXXXX
   Date Opened: April 16, 2014
   Account Status: Closed

m) SYNCB/SHOP
   Account Number: 60457712XXXXXXXX
   Date Opened: April 20, 2014
   Account Status: Closed

n) TD BANK USA / TARGETCARD
   Account Number: 585975XXXXXXXXXX
   Date Opened: October 21, 2012
   Account Status: Closed

o) VIVE/FEB
   Account Number: 674XXXXXXXXXX
   Date Opened: July 10, 2014
   Account Status: Closed

p) WEBBANK/GETTINGTON
   Account Number: 636992XXXXXXXXXX
   Date Opened: May 10, 2013
   Account Status: Closed

162.    As of May 10, 2022, Plaintiff's Experian credit report contained the following two

(2) Regular Inquiries with the following creditors, none of whom Plaintiff ever applied for credit

with:

1. US SM BUS ADMIN ODA          DATE: 07/14/2020
2. US SM BUS ADMIN ODA          DATE: 07/15/2020

163.    As of May 10, 2022, Plaintiff's Trans Union credit report contained the following

nineteen (19) credit accounts, which belong to an unrelated consumer:

a) ACCEPTANCENOW
   Account Number: 000301XXXXXXXXXX
   Date Opened: Jun 13, 2016
   Account Status: Closed

b) AMEX
   Account Number: 349992XXXXXXXXXX
   Date Opened: October 10, 2018
   Comments: Account Information Disputed by Consumer
   Account Status: Closed

c) CACH, LLC
   Account Number: 93XXXX
   Date Opened: May 26, 2017
   Original Creditor: 12 Webbank
   Balance: $7,219.00

d) CB/FLLBTY
   Account Number: 4XXXX
   Date Opened: August 27, 2015
   Account Status: Closed

e) CB/LNBRYANT

Account Number: 697800XXXXXXXXXX
Date Opened: October 27, 2014
Account Status: Closed

f)  CCB/OVERST
    Account Number: 778840XXXXXXXXXX
    Date Opened: December 8, 2014
    Account Status: Closed

g)  CCB/ZALES
    Account Number: 579097XXXXXXXXXX
    Date Opened: March 17, 2016
    Account Status: Closed

h)  CCHOLDINGS
    Account Number: 449311XXXXXXXXXX
    Date Opened: April 7, 2016
    Account Status: Closed

i)  CRDT FIRST
    Account Number: 5XXXX
    Date Opened: December 3, 2013
    Account Status: Closed

j)  KAY JEWELERS
    Account Number: 31XXXX
    Date Opened: January 25, 2013
    Account Status: Closed

k)  LVNV FUNDING
    Account Number: 546645XXXXXXXXXX
    Date Opened: August 16, 2017
    Original Creditor: 12 Credit One Bank N.A.
    Balance: $1,536.00

l)  LVNV FUNDING
    Account Number: 444796XXXXXXXXXX
    Date Opened: March 18, 2020
    Original Creditor: 12 Credit One Bank N.A.
    Balance: $709.00

m) MIDLAND FUNDING
    Account Number: 308348XXX
    Date Opened: April 28, 2017
    Original Creditor: 01 Comenity Capital Bank
    Comments: Account Information Disputed by Consumer

Balance: $2,363.00
Account Type: Open Account

n) MIDLAND FUNDING
Account Number: 307037XXX
Date Opened: July 26, 2017
Original Creditor: 01 Credit One Bank NA
Comments: Account Information Disputed by Consumer
Balance: $2,248.00
Account Type: Open Account

o) MIDLAND FUNDING
Account Number: 306565XXX
Date Opened: May 30, 2017
Original Creditor: 01 Comenity Capital Bank
Comments: Account Information Disputed by Consumer
Balance: $927.00
Account Type: Open Account

p) SYNCB/SHOPHQ
Account Number: 604557XXXXXXXXXX
Date Opened: April 20, 2014
Responsibility: UNDESIGNATED ACCOUNT
Account Status: Closed

q) TARGET/TD
Account Number: 585975XXXXXXXXXX
Date Opened: October 21, 2012
Account Status: Closed

r) VIVE/FEB
Account Number: XXX
Date Opened: July 10, 2014
Account Status: Closed

s) WEBBANK/GETTINGTON
Account Number: 636992XXXXXXXXXX
Date Opened: May 10, 2013
Account Status: Closed

164.   As of May 10, 2022, Plaintiff's Trans Union credit report contained the following

seven (7) Regular Inquiries with the following creditors, none of whom Plaintiff ever applied for

credit with:

a) AMERICAN EXPRESS  DATE:11/26/2020
b) AMERICAN EXPRESS  DATE: 09/05/2020
c) CAPITAL ONE    DATE: 09/05/2020
d) CAPTIAL ONE    DATE: 08/12/2020
e) AMERICAN EXPRESS  DATE: 12/22/2021
f) SYNCB/ZULIL    DATE: 06/18/2021
g) SYNCB/AMAZON   DATE: 03/30/2021

**Plaintiff's Third Dispute with the Credit Bureau Defendants in June 2022**

165.     On or about June 6, 2022, upset and frustrated by the continued inaccuracies on her credit reports, the Credit Bureau Defendants' repeated failure to remove the credit account information that does not belong to her, and the ongoing impact this inaccurate information had on her ability to access and obtain credit, Plaintiff mailed an additional dispute letter to the Credit Bureau Defendants disputing the aforementioned credit accounts and Regular Inquiries belonging to an unrelated consumer, which remained in her credit reports even after her multiple previous disputes.

166.     As part of her dispute, Plaintiff provided sufficient personal identification information, including her full name, date of birth, Social Security number, current address, and a copy of her New Hampshire driver's license. She also included a copy of each of the Credit Bureau Defendants' respective inaccurate credit reports.

**The Credit Bureau Defendants' Responses to Plaintiff's June 2022 Disputes**

167.     On July 9, 2022, Equifax completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff. Equifax failed to remove seven (7) of the nine (9) disputed credit accounts and failed to reinvestigate the two (2) disputed Regular Inquiries, which do not belong to Plaintiff. This inaccurate information continued to appear on Plaintiff's Equifax credit report thereafter.

168.     On July 6, 2022, Experian completed its reinvestigation of Plaintiff's dispute and

returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff. Experian failed

to remove the sixteen (16) disputed credit accounts and failed to reinvestigate the two (2) disputed

Regular Inquiries, which do not belong to Plaintiff. This inaccurate information continued to

appear on Plaintiff's Experian credit report thereafter.

169.    Additionally, Plaintiff discovered Experian was now reporting the following

American Express tradeline on her credit file that does not belong to her and did not appear on

the previous consumer disclosures she had requested and reviewed from Experian:

> a)  AMERICAN EXPRESS
>     Account Number: 349992624869****
>     Date Opened: Oct 2018
>     Status: Account charged off. $5,860 written off. $4,056 past due as of Jun 2022.

170.    Furthermore, Plaintiff discovered Experian was now reporting the following two

(2) Regular Inquiries on her credit file that did not appear on the previous Experian consumer

disclosures she had requested and reviewed:

> a)  SYCNB/HSN              DATE: Dec 17, 2021
> b)  SYCNB/AMAZON PLCC      DATE: Mar 30, 2021

171.    Finally, Plaintiff noted Experian was now reporting the following name variation

that did not previously appear on her consumer disclosures and which she did not request

Experian add:

> a)  JUANITA ESCALERA

172.    On July 5, 2022, Trans Union completed its reinvestigation of Plaintiff's dispute

and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff. Trans Union

failed to remove eighteen (18) of the nineteen (19) disputed credit accounts and the seven (7)

disputed Regular Inquiries, which do not belong to Plaintiff. This inaccurate information

continued to appear on Plaintiff's Trans Union credit report thereafter.

173.   By failing to remove disputed information that does not belong to Plaintiff but, rather, to an unrelated consumer, the Credit Bureau Defendants failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the inaccurate deceased notations from Plaintiff's credit file and report before the end of the 30-day period beginning on the date on which they received notice of the dispute from Plaintiff, as required by 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureau Defendants Publish Inaccurate Credit Reports in December 2022**

174.   On or about December 31, 2022, Plaintiff applied for a credit card issued by Capital One Bank USA NA ("Capital One").

175.   In order to determine whether Plaintiff was qualified for the credit that she sought, Capital One purchased Plaintiff's credit reports and scores from each of the Credit Bureau Defendants, respectively.

176.   At the time of Plaintiff's credit application with Capital One in December 2022, the Credit Bureau Defendants published credit reports to Capital One regarding Plaintiff that were mixed with an unrelated consumer's credit account information, which provided false and misleading information related to Plaintiff's credit history.

177.   Plaintiff's credit application with Capital One was adversely impacted as a direct result of the inaccurate information contained within her credit reports, which adversely impacted her debt-to-income ratio, credit score, and overall creditworthiness.

178.   By reporting credit accounts and other information to Capital One, which does not belong to Plaintiff but, rather, to an unrelated consumer, the Credit Bureau Defendants failed to follow reasonable procedures to assure the maximum possible accuracy of the information

contained within Plaintiff's credit files and reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's Fourth Dispute to the Credit Bureau Defendants in the Fall of 2023**

179.    In or about October 2023, soon after receiving dispute results from Experian and Trans Union, Plaintiff submitted an additional dispute to each of the Credit Bureau Defendants, respectively.

180.    Plaintiff again requested that the Credit Bureau Defendants reinvestigate the credit account and personal information that does not belong to her and correct their reporting.

**The Credit Bureau Defendants' Responses to Plaintiff's Fall 2023 Disputes**

181.    Plaintiff received correspondence from each of the Credit Bureau Defendants, respectively, providing her information as to how she could remedy the issue of information that appeared on her credit reports as a result of fraud.

182.    Plaintiff was incredibly frustrated by the Credit Bureau Defendants' responses and repeated lack of reinvestigation of the credit account and personal information that appeared on her credit reports not as the result of fraud, but because the Credit Bureau Defendants had mixed her respective credit files with that of an unrelated consumer.

183.    By failing to remove the disputed credit accounts that do not belong to Plaintiff from Plaintiff's credit files and reports, the Credit Bureau Defendants failed to conduct a reasonable reinvestigation of the information disputed by Plaintiff, or any reinvestigation at all, in violation of 15 U.S.C. § 1681i(a)(1)(A).

184.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit and/or being offered credit under adverse terms; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating and debt-to-income ratio; the expenditure of time and money disputing and trying to correct

the inaccurate credit reporting; and emotional distress, including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation, embarrassment of having false and misleading information circulated about her through her credit reports.

185.    At all times pertinent hereto, the Credit Bureau Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Credit Bureau Defendants herein.

186.    At all times pertinent hereto, the conduct of the Credit Bureau Defendants, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Each of the Credit Bureau Defendants)

187.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-186 as if fully stated herein.

188.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

189.    On multiple occasions, the Credit Bureau Defendants prepared patently false consumer reports concerning Plaintiff.

190.    Despite actual and implied knowledge that Plaintiff's credit files contained inaccurate information, including containing personal and credit information belonging to

another consumer, the Credit Bureau Defendants readily sold such false reports to one or more

third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

191.    The Credit Bureau Defendants mixed an unrelated consumer's personal and credit

account information into Plaintiff's credit reports, thereby misrepresenting Plaintiff, and

ultimately, Plaintiff's creditworthiness.

192.    The Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to

establish or to follow reasonable procedures to assure maximum possible accuracy of the contents

of the credit files and reports they published and maintain concerning Plaintiff.

193.    As a result of the Credit Bureau Defendants' conduct, action, and inaction,

Plaintiff suffered damage by loss of credit and/or being offered credit under adverse terms; loss

of the ability to purchase and benefit from her good name and credit rating; detriment to her credit

rating and debt-to-income ratio; the expenditure of time and money disputing and trying to correct

the inaccurate credit reporting; and emotional distress, including the mental and emotional pain,

anguish, humiliation, and embarrassment of credit denials, the constant stress of having another

consumer's personal and credit account information mixed into her credit files and reports,

anxiety, loss of sleep, and the stress of having false and misleading information circulated about

her through her credit reports.

194.    The Credit Bureau Defendants' conduct, action, and inaction was willful,

rendering them liable for actual or statutory damages, and punitive damages in an amount to be

determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent,

entitling Plaintiff to recover under 15 U.S.C. § 1681o.

195.    Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau

Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or

§ 1681o.

## COUNT II
### 15 U.S.C. § 1681i(a)(1)(A)
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Each of the Credit Bureau Defendants)

196.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-186 as if fully stated herein.

197.    The FCRA mandates that a CRA conduct a reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day time limitation for the completion of such an investigation. Id.

198.    The FCRA provides that if a CRA conducts a reinvestigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. 15 U.S.C. § 1681i(a)(5)(A).

199.    On multiple occasions in 2022 and 2023, Plaintiff initiated disputes with the Credit Bureau Defendants requesting that they correct and/or delete specific information and credit accounts in her credit reports that is patently inaccurate, misleading, and highly damaging to her, namely, references to her being "deceased" and credit accounts and other information that belongs to an unrelated consumer.

200.    Either the Credit Bureau Defendants conducted no reinvestigation of Plaintiff's disputes or such reinvestigations were so shoddy and unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit files and reports.

201.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i(a)(1)(A) by failing to delete inaccurate information in Plaintiff's credit files and reports after they received notice of

such inaccuracies; by failing to conduct a lawful reinvestigation of disputed personal information, credit accounts, and/or hard inquiries within the 30-day time frame required by the FCRA; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files and reports.

202.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit and/or being offered credit under adverse terms; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating and debt-to-income ratio; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress, including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, the constant stress of having another consumer's personal and credit account information mixed into her credit files and reports, anxiety, loss of sleep, and the stress of having false and misleading information circulated about her through her credit reports.

203.    The Credit Bureau Defendants' conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

204.    Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)      Determining that each of the Defendants negligently and/or willfully violated the

FCRA;

b)     Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)     Awarding Plaintiff reasonable attorneys' fees and costs from each of the Defendants as  provided by the FCRA; and

d)     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## <u>DEMAND FOR JURY TRIAL</u>

205.    Plaintiff demands a trial by jury.

Dated: February 26, 2024         By: BERGER MONTAGUE PC

*/s/Timothy Chevalier*
Timothy Chevalier, Esq., BNH #06924
**CHEVALIER LEGAL SERVICES, PLLC**
2 Whitney Road, Suite 11
Concord, NH 03301
Telephone: (603) 748-2587
tim@chevalierlegal.com

*/s/Bryan L. Plaster*
Hans W. Lodge*, MN Bar No. 0397012
Bryan L. Plaster*, MN Bar No. 0402792
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 404-1064
Fax: (612) 584-4470
hlodge@bm.net
bplaster@bm.net
*Pro hac vice application forthcoming*

*ATTORNEYS FOR PLAINTIFF*

43